IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

CORETEL VIRGINIA, LLC, )
 )
    Plaintiff, )
 )
v. ) Civil Action No. 1:12-cv-741
 )
VERIZON VIRGINIA LLC, et al., )
 )
    Defendants. )

## MEMORANDUM OPINION

This matter comes before the Court on Plaintiff CoreTel Virginia, LLC's Motion for Partial Summary Judgment with respect to Count II of the Amended Complaint and Counts I and II of the Amended Counterclaims. Also before the Court is Defendants' Motion for Partial Summary Judgment. The Defendants in this matter are Verizon Virginia LLC, Verizon South Inc., MCIMetro Access Transmission Services LLC, MCI Communications Services Inc., Verizon Business Global LLC, and Bell Atlantic Communications Inc. d/b/a/ Verizon Long Distance (collectively, "Verizon"). Defendants moved for summary judgment on Counts I, II, V, VI and VII of the Amended Counterclaims, partial summary judgment on Counts III and IV of the Amended Counterclaims, and partial summary judgment on all claims in the Amended Complaint.

Plaintiff CoreTel is a competitive local exchange carrier ("CLEC") operating in Virginia since 2005 that provides

1

telecommunications services such as telephone calls and data transmissions. Defendants Verizon Virginia LLC and Verizon South Inc. are telephone companies known as incumbent local exchange carriers ("ILECs") who provide local telephone service in Virginia. The remaining Defendants are long-distance carriers.

The Telecommunications Act of 1996 ("1996 Act") compels ILECs like Verizon Virginia and Verizon South (collectively, the "Verizon ILECs") to negotiate contracts, known as interconnection agreements, with CLECs like CoreTel. See 47 U.S.C. §§ 251(c)(1), 252. The 1996 Act also gives a CLEC the right to unilaterally select an existing contract between the incumbent and a different CLEC as its own interconnection agreement. See Id. § 252(i). CoreTel and Verizon are party to two interconnection agreements ("ICAs"), both of which were originally interconnection agreements between Verizon Virginia and Cox Virginia Telecom Inc. which CoreTel subsequently adopted. The two ICAs are identical except for pricing of certain matters not at issue here.

At issue here are interconnection charges, referred to as "facilities" charges, which consist of network resources that provide a physical link connecting CLEC and ILEC networks such as trunks, ports and multiplexing. Also at issue are the termination charges, known as "intercarrier compensation," for

2

resources within each network used to complete incoming calls to the appropriate end user. These charges can be broken down into reciprocal compensation, intrastate switched access, and interstate switched access. The ICAs govern the terms of physical interconnection of networks, the exchange of traffic between the parties, and payment of intercarrier compensation for termination of locally-dialed traffic.

The Amended Complaint in Count I seeks declaratory judgment regarding the parties' rights and responsibilities under the ICAs regarding interconnection, intercarrier compensation, and switched access charges. Count II of the Amended Complaint seeks damages for breach for nonpayment of intrastate switched access charges, among other reasons for breach. Count III requests injunctive relief to prevent the Defendants from terminating the ICAs and interconnections. The counts in the Amended Counterclaims allege the following: Count I alleges breach of the interconnection agreements for failing to pay for facilities CoreTel used; Count II is for declaratory judgment regarding facilities; Count III is for breach of the ICAs by CoreTel due to billing Verizon ILEC for calls that were originated by local telephone companies other than Verizon and were routed through Verizon ILEC's network to reach CoreTel's network; Count IV seeks a declaratory judgment regarding reciprocal compensation from the calls in Count III of the

3

Amended Counterclaims; Count V alleges breach of 47 U.S.C. § 201 by tariffing a rate in excess of the maximum permitted under 47 C.F.R. § 61.26 and charging Defendants under its federal tariff for interstate switched access services; Count VI alleges breach of state and federal law and state and federal tariffs by charging Verizon for End Office Switching and other related rates without providing such service, in violation of its tariffs and the filed rate doctrine; Count VII seeks declaratory judgment regarding interstate and intrastate switched access charges.

This Court must grant summary judgment when a party fails to make a showing sufficient to establish the existence of any essential element of the party's case on which that party has the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Fed. R. Civ. P. 56(c). A movant need only show that there is an absence of evidence or support for the opposing party's case. See Celotex Corp., 477 U.S. at 325. If the nonmovant fails to identify specific facts that demonstrate a genuine and material issue for trial, then the Court will grant summary judgment, "to prevent 'factually unsupported claims and defenses' from proceeding to trial." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting Celotex Corp., 477 U.S. at 324-25); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "Mere

unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law." Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 308 (4th Cir. 2006) (citing Felty, 818 F.2d at 1128).

A dispute over an issue of material fact is "genuine" under Rule 56 only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id. At 252.

**Facilities**

According to the terms in section 4.3.2 of the parties' ICA, in order to send calls to the Verizon ILECs' networks, CoreTel must either "provide its own facilities" to link the companies' networks or "purchase" facilities from the Verizon ILECs. Section 4.3.3 of the ICA further explains that if CoreTel elects to order from Verizon any of the interconnection methods, they may do so "...in accordance with the order intervals, and other terms and conditions, including without limitation, rates and charges, set forth in this Agreement, in any applicable Tariff(s), or as may be subsequently agreed to between the Parties." Plaintiff contends Defendants are

5

required to provide interconnection facilities to CoreTel at cost-based TELRIC (Total Element Long Run Incremental Cost) rates but that Defendants improperly charged their tariff instead.

Both parties cite to the Supreme Court's decision in Talk America, Inc. v. Michigan Bell Telephone Co., 131 S. Ct. 2254 (2011) in support of their respective positions. Plaintiff CoreTel refers to the language in Talk America that incumbent telephone service providers are required under 47 U.S.C.S. § 251(c)(2) to provide competitors, such as CoreTel, with cost-based rates for existing entrance facilities for interconnection. Id., at 2264-65. However, Defendants' have properly distinguished Talk America in that the Supreme Court was not interpreting the language of the existing contract. The FCC has held that where, as here, an existing contract is at issue, a competitor "cannot rely on the general section 251 duties to circumvent the terms of its agreement." CoreComm Communications Inc., et al., 18 FCC Rcd 7568 (2003). The FCC held that CoreComm, by "choosing to opt into an agreement that...does not provide" for a service required under § 251(c) had "effectively waive[d] any right to insist upon" receiving that service. See Id. at 7582.

CoreTel takes issue with being charged the tariffed rates for interconnection because they cite to the statutory

requirements of § 251(c)(2) and (3). However, section 252 explicitly states, "Upon receiving a request for interconnection, services, or network elements pursuant to section 251, an incumbent local exchange carrier may negotiate and enter into a binding agreement with the requesting telecommunications carrier or carriers *without regard* to the standards set forth in subsections (b) and (c) of section 251.

Plaintiff CoreTel then cites four provisions of the ICA that they claim justify their refusal to pay Verizon the tariffed rates, sections 4.2.1, 4.3.1(c), 26.1, and 27.1. Upon reviewing the ICA and the related provisions, this Court finds Defendants are entitled to summary judgment on Counts I and II of the Amended Counterclaims and partial summary judgment on Counts I and III of the Amended Complaint insofar as they address Defendants' facilities invoices because the tariffed rates are proper.

CoreTel has purportedly billed Verizon ILECS for roughly $1.7 million for facilities charges including multiplexing and trunk ports that Verizon ILECS supposedly ordered. CoreTel contends the Defendants ordered facilities from CoreTel as evidenced by Access Service Requests ("ASRs") sent by Defendants. With respect to CLEC pricing to the ILEC, Plaintiff points to page 151 of the ICA in support of these charges which provides that these "services" can be charged at "generally

available rates." As a result, CoreTel has charged Defendants TELRIC rates which are the lowest "generally available rates" set by statute and regulations. Talk America, 131 S. Ct. at 2258. Plaintiff also contends Defendants are financially responsible for the trunk ports and multiplexing to connect the parties' two "premises" as Verizon itself charges CoreTel for trunk ports and multiplexing.

However, CoreTel's bills violate the terms of the ICA as nothing in the contract authorizes CoreTel to charge for trunk ports and multiplexing that CoreTel uses when it receives calls from the Verizon ILECs. Verizon ILECs self-provisioned, at their own expense, the facilities that carry their customers' traffic to CoreTel's network. Section 4.3.4 only authorizes CoreTel to bill for multiplexing that is "necessary" to its provision of entrance facilities; it does not authorize CoreTel to charge when the Verizon ILECs – not CoreTel – provide the entrance facility. Defendants assert the ASRs are not in fact orders but rather reflect entries from Verizon's own ordering systems provided to CoreTel so that CoreTel could configure its own network to receive the calls that would be delivered over the facilities Verizon self-provisioned. The ASR that was provided to this Court as evidence of an order was in fact part of an email and only evidences the sharing of this data with CoreTel so CoreTel could configure its own network.

Additionally, the ICA section 4.2.2 conveys that Verizon ILECs are "responsible for delivering" calls to CoreTel's interconnection point, where CoreTel takes over responsibility for providing "transport and termination of traffic to its customers," indicating Verizon has no financial responsibility for the multiplexers and switch ports themselves.

The ICA itself does not authorize CoreTel to bill Verizon for these facilities because they do not provide entrance facilities to Verizon. For these reasons, Verizon is entitled to partial summary judgment as to Count II of the Amended Complaint as it pertains to CoreTel's facilities invoices only.

**Reciprocal Compensation**

The next issue relates to Counts I and II of the Amended Complaint and Counts III and IV of the Amended Counterclaims insofar as those Counts implicate reciprocal compensation charges. Defendants allege CoreTel has breached the ICA by billing the Verizon ILECs for third-party and non-local interLATA calls. The ICA requires each company to "compensate [the] other for the transport and termination of Reciprocal Compensation Traffic" which is defined as *local* "traffic that is originated by a customer of one Party on that Party's network and terminates to a Customer of the other Party on that other Party's network." Section 5.7.1 and 5.7.2(a) and (c) of the ICA prohibits CoreTel from billing reciprocal compensation charges

to the Verizon ILECs for *third-party* and *non-local* interLATA calls, yet Verizon ILECs were supposedly billed for every call delivered. The trunks can carry third-party and non-local traffic and CoreTel billed the Verizon ILECs for all of the traffic delivered over the trunk groups without regard to the source of origination or LATA. Verizon contends that all calls over these trunks were billed to Verizon without excepting the prohibited third-party and non-local interLATA calls from the charges in violation of Section 5.7.1 and 5.7.2(a) and (c).

CoreTel does not dispute that they billed reciprocal compensation charges to Verizon ILECs for every call delivered over the local connection interconnection trunk groups or that third-party and non-local interLATA calls were delivered over those trunk groups. Under the ICA, CoreTel may not bill reciprocal compensation charges that include third-party and non-local interLATA calls in addition to the local calls. As a result, Verizon is entitled to partial summary judgment on Counts III and IV of the Amended Counterclaims and Counts I and II of the Amended Complaint regarding the reciprocal compensation invoices to the Verizon ILECs for third-party and non-local interLATA traffic.

**Switched Access Charges**

The next issue this Court will address is the switched access charges. It is undisputed that CoreTel billed Verizon

10

for the "End Office Switching" service defined in its federal and state tariff. This issue revolves around the question of whether or not CoreTel actually terminates end user lines in any of its switches, thus providing end office switching defined in CoreTel's tariffs. If this question is resolved in the affirmative, this would then allow those tariffed rates to be billed to Verizon.

Both parties rely on AT&T Corp. v. YMax Communications Corp., 26 FCC Rcd 5742 (2011)("YMax Order") as support for their respective positions. Defendants assert that CoreTel has not provided Verizon with end office switching as defined in CoreTel's tariffs because CoreTel does not terminate end user lines in any of its switches. Therefore, Defendants believe CoreTel has improperly billed for services that are not within its tariffs. "A carrier can only charge its customers according to the services and rates set forth in its tariff," and a competitive LEC cannot collect its tariffed rates when "the service that [the local company] performed for [the long-distance company] is not within its tariff." CoreTel uses the internet, or the "IP cloud," to route calls from its switches to its customers and therefore does not utilize a physical transmission facility.

According to the YMax Order, the "commonly understood meanings of the terms 'termination[]'...and 'end user line' do

11

not include the type of non-physical 'virtual connection'" that
CoreTel uses and that such "'virtual' loop[s]...cannot be what
the Tariff means by 'termination' of... 'end user lines.'" YMax
Order at ¶44. The FCC in YMax held that because YMax did not
terminate end user lines in the switches that it claimed
constituted end offices, the "Tariff does not authorize YMax to
assess End Office Switching charges." YMax Order ¶45. CoreTel
has billed Defendants the composite switched access rate element
for intrastate long-distance calls and the local switching rate
element for interstate long-distance calls. Both CoreTel's
federal tariff and state tariff include end office switching
which is defined in both to involve the "use of end office
switching equipment" and "the terminations in the end office of
end user lines." The terms "termination" and "end user lines"
have established meanings within the telecommunications industry
and refer to a "physical transmission facility that provides a
point-to-point connection between an individual home or business
and a telephone company office." YMax Order at ¶39. Despite
using these settled terms in its tariffs, CoreTel does not route
calls to and from its customers via a physical transmission
facility. Instead, it uses an IP cloud to send calls from its
switches to its customers. The FCC has squarely held that the
"commonly understood meanings of the terms 'termination[]'
...and 'end user line' do not include the type of non-physical

'virtual connection'" that CoreTel uses and such "'virtual' loop[s]...cannot be what the Tariff means by 'termination' of... 'end user lines.'" YMax Order at ¶44.

Plaintiff contends YMax is irrelevant because its tariff and system architecture is completely different from the CoreTel tariff and architecture. CoreTel asserts that it can charge its tariffed composite rate for its entire switched access service, even if it does not provide End Office Switching as defined in its state tariff by relying on section 3.3.1. Section 3.3.1 states the "composite rate is not discountable based on the customer's use of only some of the identified elements." In reality, CoreTel has not provided its state tariffed switched access service at all, as that service is defined to include the routing of calls "to and from [an] End Office," which CoreTel does not have under the terms of its state or federal tariff.

Consequently, this Court shall grant summary judgment in favor of Defendants on Counts V-VII of the Amended Counterclaims and partial summary judgment in Defendants' favor on Counts I and II of the Amended Complaint as the relate to the switched access charges as the court similarly did in MCI Worldcom. See MCI Worldcom Network Servs. v. Paetec Commc'ns., Inc. 2005 U.S. Dist. LEXIS 37786 (E.D. Va. Aug. 31, 2005). Because CoreTel did not provide Verizon with the switched access service in its

state or federal tariff, it cannot bill or collect its composite tariff rate from Verizon.

For the reasons stated herein, Plaintiff's Motion for Partial Summary Judgment should be denied and Defendants' Motion for Partial Summary Judgment should be granted in the manner discussed above. An appropriate Order shall issue.

/s/<br>
Claude M. Hilton<br>
United States District Judge

Alexandria, Virginia
April 22, 2013